Opinion issued August 6, 2024



In The

# Court of Appeals

For The

# First District of Texas

_____

NO. 01-22-00956-CR

NO. 01-22-00957-CR

NO. 01-22-00958-CR

NO. 01-22-00959-CR

_____

**DANIEL CANADA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 337th District Court
Harris County, Texas
Trial Court Case Nos. 1795834, 1795835, 1795836 & 1795837

**MEMORANDUM OPINION**

A jury found appellant, Daniel Canada, guilty of four separate felony offenses of intoxication manslaughter with a deadly weapon.[1] After finding true the allegation in an enhancement paragraph that appellant had been previously convicted of a felony offense, the trial court assessed his punishment at confinement for life for each offense, to run concurrently. In three issues, appellant contends that the evidence is insufficient to support his convictions and the trial court erred in denying his motion for mistrial.

We affirm in appellate cause numbers 01-22-00956-CR and 01-22-00958-CR. We affirm as modified in appellate cause numbers 01-22-00957-CR and 01-22-00959-CR.

## Background

### *Appellant's traffic stop*

Harris County Sheriff's Office ("HCSO") Deputy G. Clayton testified that on Sunday, March 14, 2021 at around 8:00 p.m., he was leaving an "extra job" he had at a "flea market in [the] Greenspoint area" of Harris County, Texas in a HCSO crime investigation truck. He was driving northbound on Interstate 45 ("I-45") at about sixty-five to seventy miles per hour and noticed an Audi car "traveling at a

---

[1] *See* TEX. PENAL CODE ANN. § 49.08. Appellate cause no. 01-22-00956-CR, trial court cause no. 1795835. Appellate cause no. 01-22-00957-CR, trial court cause no. 1795834. Appellate cause no. 01-22-00958-CR, trial court cause no. 1795836. Appellate cause no. 01-22-00959-CR, trial court cause no. 1795837.

high rate of speed," which he first explained was "over [eighty]" miles per hour and later clarified that the car was driving closer to ninety miles per hour.

Even though Deputy Clayton did not have a law enforcement ticket system or ticket book in his truck, he felt the need to deescalate the driver's speed. So, Clayton "initiated [his] overhead emergency lights and attempted to pull [the Audi car] over." The Audi car did not pull over right away. Eventually, though, appellant pulled his Audi car over into a gas station at the Parramatta Lane exit of I-45.

After appellant stopped, Deputy Clayton, while displaying his firearm, had appellant exit the Audi car. Clayton placed him in handcuffs, patted him down, and had him sit outside of the Audi car. Clayton took these extra measures because appellant had been "moving around" inside the car, and Clayton was concerned that appellant might have been reaching for a weapon.

When Deputy Clayton asked appellant why he took so long to stop his Audi car, appellant responded that "[h]e thought he was going to jail." Appellant admitted that he had smoked marijuana, and he told Clayton that he had marijuana in the back of his Audi car, so Clayton "assum[ed]" that appellant had responded the way he did because of the marijuana. Clayton could smell "an odor of marijuana" coming from appellant's Audi car, but he did not smell alcohol on appellant.

Deputy Clayton testified that he found and confiscated a bag of marijuana from the Audi car. He glanced over the other contents of the Audi car but did not

3

do a thorough inspection. He collected appellant's identification but did not check to see if appellant had any outstanding warrants. Instead, Clayton asked appellant for his cellular telephone number and "logged everything in so [he] could" prepare a report and follow up later. After he collected the information for his report, Clayton allowed appellant to drive away.

### *The complainants*

Rhonda Branch testified that complainant 1, Porsha Branch,[2] was her daughter. Complainant 2, M.H., complainant 3, K.H., and complainant 4, D.H., were her grandchildren.[3] On the evening of March 14, 2021, complainant 1 was driving a Toyota Camry car on Farm to Market Road 2920 ("FM 2920"). Branch explained that complainant 4, an infant, was buckled in a car seat in the back seat on the passenger's side of the car. Complainant 2 and complainant 3 were also buckled in the back seat of the Toyota Camry car, although not in car seats. According to Branch, on the evening of March 14, 2021, complainant 1's Toyota Camry car was involved in a car crash.

---

[2] The record indicates that complainant 1 was twenty-eight years old on March 14, 2021.

[3] The record indicates that on March 14, 2021, complainant 2 was a two-year-old male child, complainant 3 was a four-year-old male child, and complainant 4 was a six-month-old male child.

4

*The car crash*

Devlen Runnels testified that on the evening of March 14, 2021, she and her boyfriend, Brian Harris, had gone to a bar near FM 2920 and I-45 to play darts. They left the bar around 8:00 p.m. to go home, with Runnels driving westbound on FM 2920 in a Toyota truck. About the time they passed the FM 2920 and Falvel Drive intersection, Runnels noticed a set of headlights on a car "coming up behind" her truck "very quickly to the point where [she] thought that" the car was "going to hit [her]." This occurred about five to seven minutes before Runnels and Harris reached the FM 2920 and Gosling Road intersection. The car "eventually backed . . . off, but [Runnels] kept [her] eye on [it] because . . . it made [her] nervous." Runnels continued driving, while glancing at her rearview mirror "just to make sure that" the car "wasn't . . . going to get close again, that [it] had backed off . . . a little way[]."

Runnels further explained that as she approached the FM 2920 and Gosling Road intersection, she was "trying to decide" whether to "go home down Gosling Road or . . . [to] keep going to Kuykendahl [Road] and hit [the] Whataburger" restaurant, as she and Harris "usually [did]." She then put on her blinker to get "into the right-hand lane" so that she could make the right turn from FM 2920 onto Gosling Road. She checked her rear-view mirror and side-view mirrors "to see . . . if anybody was there," then moved into the right-hand lane. Just after she had moved over, "the other car flew past." The cars in the intersection were at a standstill.

Runnels "grabbed [Harris's] arm" and said, "They're going to hit someone." (Internal quotations omitted.) Runnels looked over and "the next thing [that she] knew, [she] saw a big ball of fire."

Harris testified that on the night of March 14, 2021, he was riding in the front passenger seat of a Toyota truck driven by Runnels. While on their way home on FM 2920, Runnels moved the truck into the right-hand lane as they approached the intersection of FM 2920 and Gosling Road. Runnels grabbed his leg, and Harris looked up to see "flames" at the intersection. Runnels stopped the truck.

Harris further explained that he got out of the truck and ran to the driver's side of the burning car, which was a Toyota Camry, "[b]ecause [he] saw a leg hanging out, and [he] wanted to help get . . . the person out." First, he "pulled on the door handle," but the door "wouldn't open." Then he "pulled on [the person's] leg" to try to free her from the Toyota Camry car, but "it felt like" she was "pinned on the passenger['s] side." The car was "on fire," and "it was hard to see with all the smoke." Harris did not get any response from the person as he tried to free her from the burning Toyota Camry car.

According to Harris, someone handed him a fire extinguisher and he emptied the whole canister onto the burning Toyota Camry car, but it did little to abate the fire. By then, firefighters had arrived at the scene and told Harris "to step back." So

6

he "stepped back" and got "out of the way," but he stayed nearby in case the firefighters needed any help.

Harris and other bystanders who had been helping then went to the other side of the burning Toyota Camry car, and "someone was able to get that door open, and . . . got one of the little boys out." Harris "grabbed . . . the little boy" and placed him on a gurney that emergency medical service ("EMS") personnel had placed near the burning Toyota Camry car. Harris did not encounter appellant while he was at the scene.

Jonathan Roy Aguilar testified that he lived a few miles north of where the car crash occurred. Around 8:00 pm on March 14, 2021, he was traveling home on FM 2920 with his wife, who was driving their Nissan sports utility vehicle ("SUV"). When they reached the FM 2920 and Gosling Road intersection, they waited in the left-hand turn lane at the traffic light facing "eastbound on [FM] 2920," about to turn left to go northbound on Gosling Road. Their SUV was the first car in the left-hand turn lane. Aguilar noted that he "[s]aw [an] Audi [car]" driving and compared to the flow of the traffic around it, "it was going much faster" than "the other vehicles." Aguilar stated that the car crash then happened "very quick[ly]," like in "[s]econds." "[T]he [traffic] light had just turned [red] for the other side," and the cars on his side of FM 2920 "were still waiting" at the traffic light.

Aguilar further recounted that after the initial impact occurred between the Audi car and another car, he and his wife "just saw chaos, really, because the crash came towards [them]." They "didn't really see how it occurred"; they "just saw . . . cars coming toward[] [them]." Aguilar "saw a big truck coming toward[] [his SUV] and then another [car]" that he "couldn't identify," but later became aware that it "was the [Toyota Camry car] that [had] caught on fire" during the car crash. The truck and the Toyota Camry car "hit [Aguilar's SUV] in the front" and "kind of just exploded." The force of the impact "pushed back" Aguilar's SUV somewhere "between [five] to [ten] feet."

According to Aguilar, his SUV had damage to the front end, mostly on the passenger's side of the SUV, but Aguilar and his wife were not physically injured. Aguilar instructed his wife to back up their SUV because the Toyota Camry car in front of them was on fire, and their SUV "w[as] just really close to it." The flames from the Toyota Camry car "were going all the way up to the streetlights" and "the turn signals," about thirty to forty feet high. During Aguilar's testimony, a videotaped recording of the car crash involving the Audi car, which was captured by a surveillance camera at the Houston Methodist Spring Emergency Care Center at the intersection of Gosling Road and FM 2920, was admitted into evidence.

Jessica Withers, a case manager with the Texas Department of Criminal Justice in Huntsville, Texas, testified that she was visiting her fiancée in Tomball,

8

Texas on the evening of March 14, 2021, when she was called to her job. On her way to Huntsville, Withers stopped at the red traffic light eastbound on FM 2920 at the Gosling Road intersection in the center lane, next to the left-hand turn lane. There were two cars in front of her. She had a dashboard camera, which she turned over to law enforcement officers after the car crash. Immediately after the car crash, Withers tried to pull the driver and one of the children out of the burning Toyota Camry car, but she was unsuccessful.

Tony Basan testified that on March 14, 2021, he, his wife, and his five-year-old daughter were driving on FM 2920 toward I-45 in their truck. At the intersection of FM 2920 and Gosling Road, Basan stopped the truck in the second position in the middle lane at the traffic light. As they waited for the traffic light to change to green, they suddenly heard "a big boom noise." And "as soon as [they] looked up," they saw an airborne truck coming toward them "from the left." At the same time, they felt the airborne truck hit their truck, and another "car that was on fire" landed "literally right in front of [them]." Basan explained that the impact from the airborne truck made their truck's airbags deploy and their truck's windshield crack. Basan's wife, Ann Torrez, sustained a concussion, either from the impact of the airborne truck or the force of the airbag's deployment. Basan moved their truck away from the burning car by "back[ing] up and mov[ing] to the other side of [FM] 2920, going the opposite way from [I-]45."

9

Torrez testified that on the evening of March 14, 2021, she and her family "were looking for somewhere" to have a dinner. Basan, her husband, was driving their truck on FM 2920. At the intersection of FM 2920 and Gosling Road, Basan stopped at a red traffic light. While stopped, Torrez "heard a loud boom" but did not "know where it [came] from." When she looked up, she saw another truck "flying toward[] [them]." Torrez thought it would be stopped "because there [was] a [car] in front of them." But "when it hit that [car], it still kept coming really fast," so she "braced again" and the airborne truck hit the truck she was in.

Torrez explained that she "flew forward" and started to "hit the windshield," but she was stopped by the truck's airbag that had deployed. Her "daughter was in the back seat yelling and crying." "She was scared because she saw the truck fly toward[] [them]." The cars behind them "backed up" so that Basan could move their truck away from the fire. The family then got out of the truck; they "heard people screaming" and "saw smoke."

Torrez further testified that after exiting the truck, she saw a man sitting near a light pole about ten feet away from her. "There were [law enforcement] officers and fire[fighters] around him," but it looked like "[h]e couldn't stand on his own so [she] assumed that he was part of the [car crash], like, he was injured." According to Torrez, the man's "demeanor, . . . [was] like he wasn't there, . . . like when someone is blacked out, that was his demeanor." "The fire[fighters] and the [law

10

enforcement] officers were helping him up[,] and they got him in an ambulance and they left from the scene."

Megan Basra ("Megan") testified that on the evening of March 14, 2021, she was in a truck stopped in the left-hand lane at the traffic light at the intersection of FM 2920 and Gosling Road. Her husband, Manak Basra ("Manak"), was driving the truck, and she was in the front passenger's seat. While they waited for the traffic light to change to green, Megan was talking to Manak. As she was talking, Megan "saw sparks a little in the distance but on the other side of road, just fly up, . . . like fireworks." She exclaimed "Manak," to get his attention. (Internal quotations omitted.) Then, as Megan turned her head to look directly at Manak, she "saw the headlight of a truck start barreling toward[] [them]." When the truck hit their truck, the impact made their truck jolt backwards, and she felt her "seatbelt tighten[]." Megan "remember[ed] screaming[,] and [they] were moving and moving and moving" backwards. She felt "a few impacts," and she wondered to herself, "[W]hen [wa]s this going to stop?" The truck then stopped, and they "were at a standstill."

Because the driver's side of their truck "took the impact," Megan "looked to [Manak] to make sure that he was okay." Megan was disoriented and not "sure what to do next." She "could feel the fire that was near [them]." Manak directed her to

11

get out of the truck "as quickly as possible."  But Megan "couldn't open [her] door," so Manak "reached across" her and opened it.

When Megan and Manak walked to the front of their truck, they "saw [a] silver car was stuck into the side of [their] truck."  And they saw appellant "sitting down on the ground leaning against the [silver] car [on] the driver's side."  It was too dark to see whether he had any injuries.  Megan "saw [appellant] get up and start to walk over" near a light pole.  He stumbled a few times on his way.  As appellant was stumbling, Megan said to Manak, "He looks drunk."  (Internal quotations omitted.)  Another person "helped [appellant], and he eventually made it to the l[ight] p[ole]," where he sat down.  According to Megan, appellant "seemed just out of it."  But she was too far away from him to tell if he smelled of alcohol.

Manak testified that on the evening of March 14, 2021, he and Megan had "just finished having dinner" with Megan's parents and were headed home.  Manak was driving their truck, and he "took [FM] 2920 headed east toward[] [I-]45, and then [he] stopped at the Gosling [Road traffic] light . . . in the left[-hand] traffic lane," between the left-hand turn lane and the right-hand lane.

Manak thought that the traffic "seemed quite heavy for a Sunday night."  When they stopped at the traffic light, "all the lanes [of traffic] were filled."  While stopped, Manak was looking straight ahead, when "the [f]irst thing [he] saw . . . was just sparks flying up."  Megan "yelled [his] name; and then out of nowhere [there]

12

were just headlights beaming straight at [them]." He started screaming because "[t]here was nothing [he] could do" to get out of the way of the oncoming car. Manak reached his arm across Megan to try to protect her and "then just basically felt just multiple collisions." The truck's airbags deployed, and Manak felt "an intense heat." Then, he saw "smoke behind [him], so [he] knew [that] some car was on fire." Manak realized that he and Megan needed to get out of the truck immediately, but his driver's side door "would not move at all." So he "reached over" and opened the front passenger's side door. After Megan got out, Manak climbed over the center console and exited the passenger's side of the truck.

After Manak got out of his truck, he saw "a pretty swole black dude . . . melt[] out of" an Audi car. He explained "melt" as "like, when you're on the couch and you . . . just kind of, like, slide off because you don't really feel like getting up. Like, a very lazy just, like, I'm not going to move. I don't want to use my legs." Manak recalled that appellant "was just sitting there" until "a bystander came and helped him up." That was when Megan said, "Hey, that guy looks drunk. Get your camera out." So Manak took out his cellular telephone and took a photograph of appellant. As appellant was helped over to a light pole, Manak noted that he was "wobbly, like a baby giraffe" and "[d]idn't have his feet under him almost like . . . your first time on skates." Manak did not initially see any injuries on appellant, but as appellant sat

13

next to the light pole, Manak noticed that appellant had "a cut on his forehead and blood."

Wendy King ("Wendy") testified that on the evening of March 14, 2021, she and her husband, Lance King ("Lance"), had just picked up their daughter at a cupcake and ice cream shop where she worked, which was located on FM 2920 just east of Ella Boulevard. They picked their daughter up between 8:00 to 8:30 p.m. before heading west on FM 2920 toward their home in Tomball.

When the Kings approached the traffic light at the intersection of FM 2920 and Gosling Road, it was red. They stopped in their truck in the "center lane" and had other "vehicles behind [them]." When the traffic light turned green, they "started to go." Wendy then heard the car directly behind them get hit, and she felt "a very hard impact"—so hard that her "glasses came off [her] face" and the airbags in the truck deployed. After that, she felt "another impact, and [the truck] w[as] pushed through the intersection to the left and into oncoming traffic," causing the truck to hit "two, maybe three" other cars.

According to Wendy, the truck was so damaged that there was "pretty much not a straight panel on the entire vehicle." The driver's side front door had "popped open" and would not close. "The back window was broken out," and "[t]here was glass everywhere" inside the truck. Because of the broken "glass on the back seat," Wendy's daughter had to get out of the truck by climbing over the center console

14

and crawling out the driver's side front door. Wendy noted that "there was smoke billowing into the cabin of the truck" from a burning car that was behind them.

Wendy further explained that "OnStar" emergency services was connected to the Kings' truck, and she stayed in the truck to speak with the OnStar representative. Meanwhile, Lance went "to try to help" the occupants of the burning car. By that time though, the fire had been extinguished. After she finished the call with OnStar emergency services, Wendy "found [her] glasses, [Lance's] glasses, [her cellular] [tele]phone," and Lance's cellular telephone, which had all gone "flying from the impact." Wendy then got out of the truck.

Wendy noted that she saw appellant's Audi car at the scene. She recalled that when she was standing near it, she could smell marijuana, "like, somebody had smoked it."

Lance testified that on the evening of March 14, 2021, he was driving a truck on FM 2920, with Wendy in the front passenger's seat and his daughter in the back seat on the passenger's side. As he approached the intersection of FM 2920 and Gosling Road, the traffic light was red, and his truck was in the middle lane. After the traffic light turned green, he felt the car behind him "g[e]t hit." After the initial impact of the car crash, Lance's truck was "pitched" on the diagonal "to the right." As he "felt the truck lift," he focused on "steer[ing] and stop[ping]." The truck was being pushed into oncoming traffic, so Lance slammed on the brakes and kept "all

15

[his] weight on the brake pedal," but he could not regain control of the truck. After being hit by "oncoming traffic, . . . the air bags [in the Kings' truck] went off," and Lance lost his glasses. The truck then came "to a rest not long after that."

Lance got out of the truck and saw a car that was on fire near the passenger's side of his truck. He went with two other men to the burning car. Lance tried to get the burning car's front driver's side door open but was unsuccessful. Eventually, Lance and the other men were able to open the burning car's passenger's side rear door. They tried "to see if there was somebody there[] and pulled out a small boy" who appeared to be about three or four years old.

Lance's initial reaction, as a father, was to "clutch[]" the boy and "talk[] to him." Lance thought he "should try CPR," but there was too much debris on the ground. Lance then "notice[d] an Audi [car] on the other side of [his] truck, so [he] went over and laid [the boy]" on the trunk of the Audi car. Lance began to perform CPR on the boy while someone else was "yelling at [him] how to do it." The boy was unresponsive. At some point, someone who he believed was with EMS appeared and said, "[W]e got to take him."

### First responders

Harris County Constable's Office ("HCCO"), Precinct 4, Deputy M. Carter testified that she was on patrol on March 14, 2021, when she was dispatched at 8:40 p.m. to the scene of a car crash at 5300 FM 2920 Road, near the intersection of

16

FM 2920 and Gosling Road in Harris County. She was the first law enforcement officer to arrive at the scene; the fire department and Cypress Creek EMS were already there. Carter described the scene as "[c]haos." "Approximately [twenty] people" were milling about, and some family members of those involved in the car crash had arrived. Some were screaming, and there was "a lot of crying."

When she first arrived at the scene, Deputy Carter had a brief encounter with appellant. According to Carter, appellant "was sitting on the ground by [a] light po[le]." "He said he had a headache," but he did not appear injured. She was about sixty feet away from appellant, so she was not close enough to him "to smell any alcohol," and she did not detect any signs of intoxication.

Deputy Carter further explained that she approached the EMS personnel that were present at the scene and offered to help. While they waited for a Life Flight helicopter to arrive, she was assigned to "[p]erform CPR" on complainant 3, a young male who had been pulled from the burning Toyota Camry car. Carter observed that complainant 3's "face was bloody," as if he had "hit his face on something." He had lacerations to his nose and his cheeks. He was not responsive and "had no pulse." Carter "[f]elt like" she performed CPR on him for about thirty to forty minutes, before using a bag valve mask resuscitator on him for another forty minutes.

According to Deputy Carter, complainant 3 got back "a form of consciousness"; his pulse returned. Carter saw him "looking around for a short

17

amount of time," but then he stopped. She later learned that complainant 3 "didn't make it."

After EMS no longer needed her assistance, Deputy Carter focused her attention on the Toyota Camry car that had been "engulfed in flames." When she looked into the car, she saw the bodies of "[a] female and [an] infant [child] . . . burned into the seat of the vehicle."

Zachary Dunlap, an emergency medical technician ("EMT") with Cypress Creek EMS, testified that on March 14, 2021, he was dispatched to a car crash at the intersection of FM 2920 and Gosling Road. Dunlap explained that when he first arrived at the scene, he saw "multiple vehicles with significant damage," as well as one that "looked to be fully engulfed" in flames. He administered CPR to complainant 3. The first thing that he observed "was the blood coming from [complainant 3's] face and . . . that he was lifeless"; he did not appear to be breathing. Dunlap "[c]ontinue[d] the CPR and then start[ed] working on [complainant 3's] airway because [he] didn't see any" external injuries on complainant 3 that needed immediate medical treatment.

While in the back of the ambulance with complainant 3, Dunlap "continued resuscitative measures" and intubated complainant 3 "to secure [his] airway." Dunlap then performed a thoracostomy to release "any blood or air that may have

accumulated" and to "let the lungs re-inflate" in case complainant 3 had a collapsed lung, which was a potentially reversible cause of death in a "traumatic arrest patient."

Through Dunlap's efforts, complainant 3 "regain[ed] a pulse," but his pupils remained "fixed and dilated," which indicated that complainant 3 had a "[s]ignificant brain injury." According to Dunlap, complainant 3's pulse continued for "around [twenty] minutes" while Dunlap was attending to him, but Dunlap did not know how long complainant 3's pulse continued after that. Dunlap observed that generally a "[t]raumatic arrest ha[d] a very low survival rate." For that reason, his approach to treating complainant 3 was to first address "the potential reversible causes," by helping him breathe and then "giv[ing] him thoracostomies" to see whether complainant 3 could survive. If those efforts were unsuccessful, Dunlap then would try to "maintain a pulse" in case complainant 3 could potentially be an organ donor. A Life Flight helicopter ultimately transported complainant 3 to the hospital.

Ricardo Rivera, an EMT with Cypress Creek EMS, testified that on March 14, 2021, he was dispatched to a car crash at the intersection of FM 2920 and Gosling Road. Upon arrival at the scene, Rivera remembered hearing over the dispatch radio that one of the child complainants from the crash had been taken to the Houston Methodist Spring Emergency Care Center across the street from the scene. Accordingly, Rivera went into the emergency care center and found the doctor who was treating complainant 2, a two-year-old male. After finding complainant 2,

19

Rivera "saw that [he] was already intubated" and unresponsive. Rivera explained that "at all times" complainant 2 remained unresponsive, and he was not "breathing at all." At the emergency care center, personnel were using a bag valve mask to oxygenate complainant 2, who had "a heart rate of 107." The emergency care center personnel had not been "able to get a blood pressure" reading, which indicated that complainant 2 was in shock. Eventually, Rivera took complainant 2 out of the emergency care center so that he could be transported by a Life Flight helicopter to the hospital.

*Medical treatment of appellant*

Nick Stuart, an EMT with Cypress Creek EMS, testified that on March 14, 2021, he was "in a field officer training role" and was working with a trainee, Trystan Foret. At around 8:30 p.m., Stuart and Foret were dispatched to a car crash at the intersection of FM 2920 and Gosling Road. Before they "arriv[ed] on-scene, they were informed that the[ir] patient," appellant, "was going to be by a [light] pole on the corner of the intersection."

Upon arrival at the scene, Stuart saw "wrecked cars pretty much throughout the intersection." When Stuart spoke with appellant, appellant "seemed somewhat confused." Stuart and Foret "had to ask [appellant] his name several times before he answered." Appellant eventually "referred to himself as 'D.'"

According to Stuart, appellant "had a fairly large abrasion" to the top of his head near his forehead, and Stuart and Foret determined "that [appellant] probably had a head injury" because of the location of the abrasion and because he was acting "altered."

At some point, appellant was taken to an ambulance. While appellant was in the ambulance, Stuart and Foret attempted to "establish[] IV access" but appellant kept "trying to pull . . . out" the intravenous line. Stuart did not "smell anything particular on [appellant's] breath," but appellant "[h]ad a very strong odor about him of marijuana." As to why he did not smell alcohol on appellant, Stuart stated that he did not "happen to smell alcohol very well."

Stuart further testified that on the way to a hospital, appellant appeared to have reflexive movements that resembled posturing and had "seizure-like activity," which, according to Stuart, were very common to see after a head injury. Stuart and Foret gave appellant ketamine to sedate him.

Foret testified that on the evening of March 14, 2021, he was an EMT trainee with Cypress Creek EMS, when he was dispatched, along with Stuart, to the scene of a car crash at the intersection of FM 2920 and Gosling Road. Foret noted that when he arrived at the scene, one of the cars involved in the crash "had recently been extinguished," and according to Foret, it had been "burned beyond recognition." Foret then made contact with appellant, who was leaning against a light pole. Foret

21

recalled that appellant's clothes smelled of marijuana, and Foret stated that he could smell alcohol on appellant's breath. Appellant was subsequently taken by ambulance to a hospital.

Stacie Nieburger-Smitham testified that she previously worked at Memorial Hermann The Woodlands Medical Center ("Memorial Hermann—The Woodlands") in the hospital's laboratory. On March 14, 2021, hospital staff drew blood and urine specimens from appellant for the purpose of his medical treatment. Appellant's medical records from the hospital contained narcotics-use testing results showing that appellant tested positive for benzodiazepines, cannabinoids, and opiates. They also showed that appellant's blood-alcohol concentration ("BAC") was 0.15 grams of ethanol per 100 milliliters of blood.[4]

*Law enforcement officers' investigation*

HCCO, Precinct 4, Sergeant K. Walker testified that on the evening of March 14, 2021, he was dispatched to the intersection of FM 2920 and Gosling Road following a car crash. Upon arriving at the scene, he saw appellant being treated by EMTs near the light pole on the northeast corner of the FM 2920 and Gosling Road intersection. When Walker saw the EMTs "begin to wheel [appellant] away on[] a stretcher towards an ambulance," he went over and asked the EMTs "if they knew

---

[4] Copies of appellant's medical records and the hospital's laboratory records related to appellant were admitted into evidence at trial.

22

who [appellant] was, what sort of vehicle he came out of or any other information like that." They responded that "they did not have any identifying information . . . for [appellant], but they did tell [Walker] that [appellant] was being transported to" Memorial Hermann—The Woodlands.

Deputy Walker "relayed that information to the other [law enforcement] officers" at the scene. He also contacted HCCO Deputy D. Simmons, who was not at the scene, and instructed him "to go to the hospital to try to get a status update" on appellant's condition. After Walker learned that appellant "was the driver of the Audi [car] and that he [might have been] under the influence of either alcohol or an unknown drug or narcotic," Walker also went to the hospital.

Deputy Walker further explained that upon arriving at the emergency department at Memorial Hermann—The Woodlands, he found appellant "unconscious and intubated." The hospital disclosed that appellant's BAC was 0.15 grams of ethanol per 100 milliliters of blood, and appellant had "[cannabinoids], benzodiazepines, and opiates in his system."

While Deputy Walker was at the hospital, he also encountered the EMTs from Cypress Creek EMS who had transported appellant to Memorial Hermann—The Woodlands. Walker asked EMT Stuart if he had noticed whether appellant had "an odor of alcohol or marijuana." Stuart told Walker "that he just noticed a strong odor of marijuana coming from [appellant]."

23

HCCO, Precinct 4, Sergeant A. Setterbo, a member of the accident investigation team, testified that on March 14, 2021, he responded to a call notifying him "that a major [car] crash had happened" at the intersection of FM 2920 and Gosling Road. Setterbo arrived at the scene about 10:00 p.m. By the time he arrived, other law enforcement officers had "already secured the scene" and had blocked "all the roadways."

Sergeant Setterbo further explained that "[t]he scene was very hectic," with a lot of law enforcement officers and emergency services responders. There were also "civilians trying to help other people out," and apparently some "family members [were] on scene." Additionally, there were possible witnesses who had been "secured on-scene just in case they knew anything that could . . . help with [law enforcement officers'] investigation."

According to Sergeant Setterbo, he familiarized himself with the car crash scene by "walk[ing] [it] a few times." And he started to "understand[] what specific parts" of the investigation that law enforcement officers "really needed to focus on." He "walk[ed] the scene" with the law enforcement officer who was taking photographs to make sure that "specific parts" were documented, such as where law enforcement officers "believe[d] the initial impact occurred" and "other debris fields" that might not have been documented initially.

While at the scene, Sergeant Setterbo took out "the Sokkia Total Station," a type of "surveying equipment" that he used to calculate the "GPS points of where debris [wa]s found" as well as "gouges or skid marks or scrapes . . . in the roadway." The Sokkia device had three parts: (1) the "head unit," which "measure[d] everything," (2) "the pole unit," and (3) "the tablet," which was used to operate the device. In addition to debris and marks on the roadway, an operator of the Sokkia device could "add some reference points along the roadway," so that the GPS points laid over a map of the roadway would be "the exact measurements." Setterbo explained that "all those measurements [we]re just little pieces of the puzzle to help [the law enforcement officers] reconstruct the [car] crash."

Sergeant Setterbo further testified that the measurements taken with the Sokkia device were ultimately used to create an illustration of the position of the cars involved in the car crash just before it happened. The illustration, a copy of which was admitted into evidence, depicted "the intersection of Gosling Road and FM 2920 and where [law enforcement officers] believe[d] the cars were located . . . prior to the crash." The illustration was made using a computer software program that placed "the GPS pinpoints" on "a map of the scene; and those GPS pinpoints [were] overla[id] on the roadway to show . . . exactly where th[e] evidence [wa]s located on the roadway."

Sergeant Setterbo next described the type of damage sustained by the different cars involved in the crash. As to the damage to the Toyota Camry car, where the complainants were found, Setterbo explained that the car had sustained both front- and rear-end damage, which "from all the crashes" that he had investigated, usually indicated "that it was in the middle of two [cars] when the crash occurred. So[,] it [got] hit from the rear and pushed into the vehicle in front of it."

As for the Kings' truck, Sergeant Setterbo noted that from one point, the damage "look[ed] like it [was] in the front; but the way that the tailgate" was also "bent up," he could tell that the truck had been hit hard enough at its rear-end "to bend the frame of the truck up."

As to appellant's Audi car, Sergeant Setterbo explained that it had "all heavy front-end damage." The hood was "bent up" and the front end was "bent . . . down." The front-end damage on the Audi car indicated to Setterbo "[h]ow serious the crash was" because it had "bent everything up on it." But the main "thing that stuck out to [Setterbo] more than anything else was how bad[ly] the Toyota [Camry car carrying the complainants] was crushed." Further, according to Setterbo, the damage to the Toyota Camry car "matched up with the damage on [appellant's] Audi [car]." And the front-end damage on the Toyota Camry car showed that "[t]he pathway of th[e] Audi [car] . . . was pretty much directly in an east to westbound direction, so it was pretty much a square-on hit."

26

HCCO, Precinct 4, Sergeant J. Churgin testified that on March 14, 2021, he went to the car crash scene at the intersection of FM 2920 and Gosling Road. Churgin arrived after EMS had already transported certain individuals away from the scene. While there, Churgin "walked the scene to . . . assess the situation." He saw "several cars in the intersection." One car was completely burned, and two of the complainants' bodies were still in that car. Churgin also saw the Audi car that was involved in the car crash. The Audi's front driver's-side door was open, and Churgin "smelled the odor of marijuana coming from the inside of the car."

Sergeant Churgin contacted HCCO, Precinct 4, Sergeant R. Wolsey to come to the scene. Then, Churgin "gathered all the witnesses and . . . brought them back" to his patrol car, where they waited for Sergeant Wolsey to interview them. According to Churgin, Wolsey's witness interviews were recorded on Churgin's patrol car's dash camera and his "body-worn camera."

A day or two later, Sergeant Churgin assisted Sergeant Wolsey at the "accident investigation [car] lot." They collected DNA samples from the interior of the Audi car, and Churgin took photographs to document the collection. After Churgin photographed the airbags that had deployed in the Audi car, Wolsey collected them as evidence. Later, Churgin and Wolsey also "did some mathematical measurements based on [a] video[taped recording] from the [car crash] scene." And Churgin assisted Wolsey with conducting a time/distance

27

calculation using a videotaped recording from a surveillance camera at the H-E-B grocery store near the FM 2920 and Gosling Road intersection.

Sergeant Wolsey testified that he was the West Side Patrol Supervisor and his primary duties involved accident reconstruction and car accident investigation. He arrived at the car crash scene on March 14, 2021 around 9:15 p.m.

Sergeant Wolsey explained that on March 14, 2021, he used Sergeant Churgin's body-worn camera to record all the witnesses that he interviewed that night. Wolsey determined that certain cars involved in the crash had been moved from their original post-crash positions, but through witness interviews, he was able to place the location of each car before the crash onto a map.

As to the car crash itself, Sergeant Wolsey identified "three separate harmful events" that occurred in the crash. The "first area of impact" was where complainant 1's Toyota Camry car was stopped or in slow motion at the time it was struck from the rear by appellant's Audi car. The "[s]econd area of impact" occurred "[w]hen the Audi [car] came in contact with" complainant 1's Toyota Camry car, and both cars "moved forward as one unit." Together the Audi car and the Toyota Camry car struck the back of the Kings' truck. The "[third] area of impact" was where complainant 1's Toyota Camry car and appellant's Audi car "initially enter[ed] the intersection as one unit," then "separated," and the Toyota Camry car struck the front of Aguilar's Nissan SUV. Next, complainant 1's Toyota Camry car skidded

"sideways," struck "a glancing blow to the front of [Aguilar's] Nissan [SUV]," and "erupt[ed] into flames." Appellant's Audi car, meanwhile, veered into "more of a 45- to maybe 50-degree departure from the original direction of travel," until it struck the front driver's side door of Manak's truck.

Sergeant Wolsey further explained that the Kings' truck continued moving from the impact in between Aguilar's Nissan SUV and Manak's truck, and then struck Manak's truck, putting it "into . . . motion before [appellant's] Audi [car] pick[ed] it up and carrie[d] it to [its] final rest[ing]" place. The Kings' truck then continued its path, striking Basan's truck "on the front left corner of the vehicle."

Sergeant Wolsey noted that appellant's Audi car had damage "distributed all across the front," which showed that "the force that the Audi [car] sustained came straight in from the [twelve] o'clock position." The front hood of appellant's Audi car "was crushed up," and there was "a lot of intrusion to the windshield." The damage to the front hood showed that "[s]omething rode up onto the hood" or that there was "enough force that it crushed from the bumper all the way into the hood back to where it met maximum engagement." Wolsey explained that "[m]aximum engagement [wa]s a term used when one or multiple vehicles come into contact with each other or an object," when "the energy of that car . . . [wa]s met to the point where it c[ould] no longer continue going through a hit." According to Wolsey, "once [a car] reache[d] the maximum engagement, it[] [was] not going to penetrate

29

any further.  It w[ould] reach and it w[ould] have, like, a form of elastic rebound where they[] [would] separate from each other."

Sergeant Wolsey also noted that all the damage to the front of complainant 1's Toyota Camry car occurred because it was pushed underneath the Kings' truck. That damage came from "the twelve o'clock position," i.e., it was "fully distributed across the front" of the car.  The intrusion to complainant 1's Toyota Camry car "was quite severe", "and the maximum engagement reached all the way to the shaft of the front seats."  According to Wolsey, the severity of that damage to complainant 1's Toyota Camry car was rated at a seven, which was the highest damage ranking for a crash report.  "The damage rating to the rear" of complainant 1's Toyota Camry car was rated a six.  That damage came from "the [six] o'clock position," i.e., the rear and "was rear distributed."  As to the Kings' truck, Wolsey opined that the damage "was caused when it hit the glancing blow between" Aguilar's Nissan SUV and Manak's truck.

Sergeant Wolsey also explained that he used a FARO 3D scanner at the car crash scene to create data points and then used the FARO software program to create a series of animations that reconstructed the car crash.  Using those tools, and after "nearly a year of investigation," Wolsey was able to compile the information necessary to reconstruct the car crash to determine its cause.  Wolsey explained that as appellant's Audi car approached Gosling Road, it "did not adjust or account for

the impeding hazard." And because of appellant's "failure to control speed at 115 miles an hour," his Audi car struck the back of complainant 1's Toyota Camry car. According to Wolsey, that impact caused appellant's Audi car and complainant 1's Toyota Camry car to merge into one unit as they traveled forward, striking the rear of the Kings' truck. The "momentum and energy was enough" to carry both cars into the Kings' truck, which then "thr[e]w all three of those [vehicles] into the intersection." The Kings' truck and complainant 1's Toyota Camry car then "separated from [appellant's] Audi [car]. The Audi[] [car's] momentum continued at a glance toward the left or at about a 45[-]degree angle." At the same time, the "momentum of the [Kings' truck] and [complainant 1's] Toyota [Camry car] continued forward into" Manak's truck and Aguilar's Nissan SUV. Then, as the Kings' truck and complainant 1's Toyota Camry car "came together," the Toyota Camry car "entered into a side slip or a side skid, at which point the side of the [Toyota Camry car] struck the front of [Aguilar's] Nissan [SUV] at the same time that the [Kings' truck] struck [Manak's] truck resulting in an initial explosion -- a burst of explosion." The Kings' truck's momentum "continued through th[at] path" until "it struck the left front quarter of [Basan's] truck, and then it finally c[a]me to rest."

According to Sergeant Wolsey, the impact of complainant 1's Toyota Camry car into the Aguilar's Nissan SUV forced the SUV "back a slight distance." It also

"set [Manak's truck] into a side skid to where [appellant's] Audi [car] picked [Manak's truck] up." And "[w]hen [appellant's] Audi [car] hit [Manak's truck], it shoved it back" with enough force that Manak's truck went into the "right front of [a] Buick [car]," then continued to a final resting place.

Sergeant Wolsey opined that as a result of the chain reaction—which appellant set in motion—complainant 1's Toyota Camry car "burst into flames, resulting in" the complainants' deaths.

Sergeant Wolsey also noted that during his investigation he eliminated other certain potential causes of the car crash that killed the complainants. He explained that "[i]n this case, there was no signage," "no broken-down vehicles" obstructing the roadway, "no pedestrian cross traffic," "no other traffic," and "no bright lights too close to the roadway that would blind the individual as [he] approached." And according to a CARFAX report, appellant's Audi car had no mechanical issues. Wolsey's review of appellant's medical records and driving record did not reveal that appellant had any health condition that might have affected his driving.

Sergeant Wolsey further testified that appellant's BAC was 0.15 grams of ethanol per 100 milliliters of blood and appellant tested positive for cannabinoids and benzodiazepine. Wolsey remarked that ethanol, cannabinoids, and benzodiazepine were substances that were "central nervous system depressants, [meaning they] tend[ed] to slow down a person's reaction time." Wolsey also

observed that appellant's Audi car was travelling at 115 miles per hour when it hit complainant 1's Toyota Camry car. According to Wolsey, that was a "reckless and extremely dangerous" speed at which to be travelling.

*Forensic evidence*

Jason Gaswint, a Harris County Institute of Forensic Sciences ("HCIFS") toxicologist, testified that as part of his job, he "perform[ed] scientific testing[] on biological fluids and tissues to identify any drugs or chemicals in the body." In this case, Gaswint tested the urine sample which was collected from appellant at the hospital.

Gaswint detailed the processes that he used to analyze specimens, including quality control procedures. He tested appellant's urine sample twice. The "first analysis [wa]s to screen for the presence of ethanol" in appellant's urine. And the "second analysis [wa]s to confirm the results from the first analysis." Gaswint prepared a laboratory report related to his urine analysis, a copy of which was admitted into evidence. He stated that the legal limit for ethanol in Texas was "0.080 grams of ethanol per 67 milliliters of urine." The test result for appellant's urine sample was 0.113 grams of ethanol per 67 milliliters of urine, which was above the legal limit.

James Sailors, a HCIFS toxicologist, testified that, as part of his job, he analyzed "biological samples for the presence of drugs, alcohol, and/or chemicals."

33

Sailors explained that he tested the blood samples drawn from appellant at the hospital; one blood sample was drawn from appellant for medical purposes and the other blood sample was drawn from appellant pursuant to a search warrant. A toxicology report, a copy of which was admitted into evidence, showed that the sample of appellant's blood drawn for medical purposes was drawn on March 14, 2021, at 9:11 p.m. At that time, appellant's BAC was "0.123 [grams of ethanol, plus/minus 0.019 gram[s,] per 100 milliliters" of blood. This was higher than the legal limit which Sailors stated was 0.08 grams of ethanol per 100 milliliters of blood. The toxicology report further stated that the sample of appellant's blood obtained pursuant to the search warrant was drawn on March 15, 2021, at 3:40 a.m. At that time, appellant's BAC was 0.028 grams of ethanol per 100 milliliters of blood.

Kelsey Cooper, a HCIFS toxicologist, testified that she analyzed appellant's blood sample that was drawn pursuant to the search warrant to determine whether tetrahydrocannabinol ("THC") was present in the appellant's blood. She determined that THC was present in the blood sample.[5]

---

[5] A copy of the toxicology report that was admitted into evidence showed that appellant's blood sample that was obtained pursuant to the search warrant was positive for THC.

Chianti Porter, a HCIFS toxicologist, testified that she analyzed plasma from the sample of appellant's blood that was drawn for medical purposes. And she testified that she found THC "present" in appellant's blood sample.[6]

Andrew Greenwood, a toxicologist at HCIFS, testified that he tested the blood sample drawn from appellant pursuant to the search warrant, and he identified the presence of alprazolam, a benzodiazepine, in appellant's blood sample.[7]

Francisco Chavez, a HCIFS toxicologist, testified that he tested the blood sample drawn from appellant for medical purposes for the presence of alprazolam, and he found that alprazolam was "present" in that sample.[8]

Dr. Anna Kelly, HCIFS's Assistant Director of Forensic Toxicology, provided general information about laboratory analysis, the effects of ethanol on the human body when operating a car, and the absorption of ethanol into the body's bloodstream. She explained that "[e]thanol [wa]s classified as a central nervous system depressant." The "central nervous system [wa]s comprised of the brain and

---

[6]     The copy of the toxicology report that was admitted into evidence showed that appellant's blood sample that was drawn for medical purposes was positive for THC.

[7]     The copy of the toxicology report that was admitted into evidence showed that appellant's blood sample that was obtained pursuant to the search warrant was positive for alprazolam.

[8]     The copy of the toxicology report that was admitted into evidence showed that appellant's blood sample that was drawn for medical purposes was positive for alprazolam.

35

spinal cord, so it[] [was] responsible for controlling the actions of the body." And the ingestion of ethanol caused "depression of [a person's] inhibitions." At first, "some people become more talkative" after ingesting ethanol. But "[a]s the [ethanol] level" in the person's bloodstream rises, "more complex functions . . . [become] compromised," causing "increased reaction time, slowed information processing, increased risk-taking," and impairment of other functions "like that." As the ethanol level in a person's bloodstream continues to "rise[] past that, . . . more basic functions" become "compromised and depressed." A person might "slur[] [his] speech, not able to walk in a straight line, [and] things like that."

Dr. Kelly also observed that driving a car constituted "a divided attention task." Different things happened every time a person drove, so a person "ha[d] to be able to see something and respond to it." If a person was "under the influence of ethanol [though], [he was] going to take longer to respond to situations." He "might have issues maintaining [his] position within [his] lane of travel" while driving or he "might have issues [with] . . . seeing something and hitting the brakes if [he] need[ed] to." Perceiving the distance between the car the person was driving and the next car ahead of him could be compromised as well.

Dr. Kelly noted that THC could also "impair somebody's cognition and perception" by "caus[ing] issues with increased reaction times, as well as . . . the ability to stay within" a traffic lane while driving. And THC could "impair

36

tracking," so "if [a person was] driving behind somebody and [the other person] change[s] [her] speed, that perception of that speed changing [would] also [be] impaired under the influence of THC."

As to alprazolam, Dr. Kelly explained that it was a benzodiazepine and similar to ethanol. It was "classified as a central nervous system depressant so [a person] would expect [to have] th[e] same kinds of issues with impairment while driving as [he] would with ethanol." Common side effects from using alprazolam included "drowsiness, confusion, [and] sedation." Further, Dr. Kelly stated that if someone took "a combination of [ethanol, THC, and alprazolam]," the person would be expected to have more impairment than if just one of those substances had been taken. Dr. Kelly reported on a study that she had reviewed in which individuals were dosed with ethanol until they had "approximately a 0.04 level of ethanol in the blood," and they were also given THC in "different concentrations" before being sent "out on the road to drive." The results of the study showed "impairment [that was] consistent with [a BAC] above [0].08" when the ethanol and THC were "combined." And Dr. Kelly noted that combining ethanol and alprazolam was reported to have a similar "additive effect."

Megan Chapin testified that in March 2021, she was working as a Forensic Death Investigator at HCIFS for the Medical Examiner's Office Division. Chapin explained that as a forensic death investigator she worked "directly under a medical

37

examiner/pathologist" and "assist[ed] the medical examiner/pathologist in determining the cause of death."

Chapin further explained that on March 14, 2021, she first arrived at the car crash scene at the intersection of FM 2920 and Gosling Road at about 11:13 p.m., but "because the scene was so large and law enforcement [officers] had so much to photograph and process . . . before anything could be moved, they were not ready" for her to "start looking at possibly moving the individuals who had died," so she left the scene and returned about an hour and a half later.

Upon returning to the scene, Chapin found that complainant 1's Toyota Camry car "was pretty crushed in on both the front and back ends" and "was charred." She could see the bodies of complainant 1 and complainant 4 inside in the car. Complainant 1 "was in the front area" of the car, and complainant 4 was in "the back seat," which had been "so crushed in" that complainant 4 "was kind of pinned" between the "metal framework of the back and front seats." Because of the fire damage to complainant 1's car, "the seats didn't even have fabric" on them; they "were just metal frames." Chapin also could not find any fabric "indicating a seat belt or even if the air bag had gone off or not because there was just so much damage."

Because it was dark outside, it was difficult for Chapin "to see exactly what everything was." In the back seat of complainant 1's Toyota Camry car, Chapin saw

38

"a lot of clothing," "debris," and "plastic." Complainant 4 "was kind of on his side with . . . some sort of object kind of around or behind [him]." After complainant 4's body was moved out of the car, Chapin "could see there was actually kind of a shell that looked like a car seat." It had "the backing of a car seat and fabric and what could have been the fabric of the car seat straps." But "[e]verything was so charred" that it was difficult for her "to say exactly how that had been," but it "looked to [her] like [complainant 4] was lying back in a car seat."

In examining complainant 4's body, Chapin observed that his hands had "some bone exposure" due to thermal damage. She also saw "some blood-tinged substance . . . coming out of [his] nose." Complainant 4's skin had been "burned away" on his skull, and there was "some fracturing of the skull . . . that showed some brain exposure from that area and then from the nose, as well."

As to complainant 1, Chapin observed that she was an adult female whose body was lying across the driver's seat and the front passenger's seat with her back against the middle console. Chapin noted that "[t]here was a lot of plastic and other debris" pushed to the front of the car and complainant 1's body was lying "with her head on top of items that were in the [front] passenger's seat" and her left foot was "on the floor of the driver's side." Complainant 1's body "also had some thermal injuries" and "some bone exposures" on both of her legs and her right arm. And

39

there were "burns all over her clothing," which had been "ripped or burned away to an extent."

At this point during Chapin's testimony, the trial court announced that it would take a five-minute break. A person sitting in the courtroom then began crying, and the bailiff escorted the jury out of the courtroom. The trial court told the person who was crying, "Ma'am, you need to leave the courtroom. Thank you." A short time later while the jury was not present, the trial court stated the following:

> All right. We are on the record. The jury is outside of the courtroom.
> I'm sure there is something that [appellant] is going to want to put on the record but so that any reviewing courts have the full picture, from the [trial court]'s point of view. The – who I assume are family members of the complainants have, in [the trial court]'s opinion, been very quiet throughout the proceedings. There have been no audible or even visible displays of emotion. The [trial court] could see, though the [trial court] does not believe the jury noticed, that one woman who has been present for the entire trial was dabbing at her face, but it was not audible.

> The [trial court] could sense, because the [trial court] has a direct line of sight to the complainant[s'] family or whoever has been showing up, that it was a good time to take a break because, while they were not audible and, again, I don't even think visible to this jury, the [trial court] could appreciate that that would have been emotional testimony for someone who knew the complainants.

> The [trial court] released the jury in an effort to give those family members a breather. [The trial court] would say six members of the jury were still filing out of the courtroom and the door to the jury – the hall leading to the jury room was open when the woman in question began audibly sobbing.

40

[The trial court] asked everyone to leave and [the State] escorted the family out to the vestibule that is outside of the courtroom. There were audible displays of emotion, not actual words, but cries from people who were here for the complainants.

The jury was filing out. The [trial court] would assume that at least some of the jurors heard what were cries.

Does anyone want anything else to be on the record?

Appellant's counsel then responded:

This is why we objected and we have been trying to stipulate because we knew this was going to be emotional testimony and it was walking the line into unnecessary, very gruesome emotional testimony about bones and brains coming out and all of this other stuff that was unnecessary.

[The trial court] did – I would agree with [the trial court]. [The trial court] excused – made a break when we could not hear and I actually never saw that happening. However, when [the trial court] asked for a break, that is when – it's the mother of [complainant 1], she was the one sitting here the whole time. She began to shriek at the top of her lungs as the jury was filing out.

Then another woman behind her also began to shriek at the top of her lungs and sobbing, emotional crying as the jury was still in this room and walking out. And then once they got outside, . . . they raised their voice[s] even more to include shrills and shrieks so we could all hear; and I'm sure half of this floor of the court heard.

And I'm sorry, . . . but we've warned the State about this emotional testimony. [The trial court] had cautioned [the State] if we're going to have any, we need to give them a warning about the sensitive material that's going to be brought out. I already objected ten minutes before this happened and told them I'm stipulating to the deaths of these four people that died as a result of an accident that [appellant] caused. The State has refused to accept the stipulation and, therefore, by eliciting this testimony and causing this emotion, I reluctantly – even though I do not want to – I reluctantly must move for a mistrial.

41

The State replied:

> . . . [T]his is a terrible emotional case. The human beings [who] are sitting in the back, I have counseled them many times before trial. I have told them about the evidence that is going to come out. I have told them to  -- when certain witnesses are about to take the stand, that if they cannot take that, please step out. And like the [trial court] has observed, for the majority of this trial, they have stayed quiet. They have limited their emotional outbursts. I haven't heard any until today, but I can also understand that sometimes people have a breaking point.
>
> I would ask the [trial court] to deny the mistrial.

The trial court denied appellant's request for a mistrial, explaining:

> There has been much discussion . . . of stipulating to the death of the complainants; and [trial court] think[s] the record should reflect that the [trial court] has told both sides that if they want to reach some stipulation agreement, that the [trial court] w[ould] entertain that. But as of right now, that has never happened. The [trial court] is of the opinion that the State is allowed to put on testimony and evidence regarding the deaths of the complainants.
>
> So the record is clear – just because it's on my mind now – the [trial court] has seen very graphic video evidence of the complainants who were in – found deceased in the vehicle. The [trial court] has been told by the State that there are numerous photographs of both [complainant 1] and [complainant 4] that are not being offered to this jury.
>
> In fact, to be frank, the [trial court] has been pleasantly surprised by how little graphic evidence in picture or video form there has been of the bodies that were in the vehicle, the bodies of [complainant 1] and [complainant 4]. So that is not a statement on how [trial court] will rule, but [trial court] want[s] the record to reflect that outside of the testimony of this witness, there has not been a lot of visual evidence of the bodies of [complainant 1] and [complainant 4].

After the jury returned, the trial court gave it an instruction requested by appellant, stating:

> . . . [Y]ou are instructed to disregard the emotional outburst that occurred just before you left the courtroom and you are instructed that you may not consider it as any evidence or for any purpose whatsoever. You may also not mention it nor discuss it in any of your deliberations.

The trial court also polled the jury, asking each of the jurors if they could promise the trial court that they would "not consider the emotional outburst for any reason and base [their] verdict solely on the facts and evidence presented in this case." All jurors responded that they could.

Dr. Pramod Gumpeni, HCIFS's Deputy Chief Medical Examiner, testified that the complainants died because of the car crash. She explained that the complainants' autopsies had been performed by Dr. Lucile Tennant, who had retired. Complainant 1's cause of death was "multiple blunt force injuries and thermal injuries," and Dr. Gumpeni opined that complainant 1 died instantly.[9] As to complainant 2, Dr. Gumpeni stated that complainant 2's cause of death was "[b]lunt force and thermal injuries," and complainant 2 died after being taken the hospital.[10]

---

[9] A copy of complainant 1's autopsy report was admitted into evidence. It stated that complainant 1, a twenty-eight-year-old female, died at 8:49 p.m. on March 14, 2021 at 5100 FM 2920. Complainant 1 was the driver of a car that was involved in a car crash.

[10] A copy of complainant 2's autopsy report was admitted into evidence. It stated that complainant 2, a two-year old male child, died at 1:57 a.m. on March 15, 2021 at a hospital. Complainant 2 was a passenger in a car that was involved in a car crash and was taken to the hospital by a Life Flight helicopter.

43

As to complainant 3, Dr. Gumpeni testified that complainant 3 died at the hospital and the cause of his death was "multiple blunt force injuries." Most of complainant 3's blunt force injuries were to his head.[11] Complainant 4 was a six-month old male child, and his cause of death was "multiple blunt force and thermal injuries."[12]

## Sufficiency of Evidence

In his first and second issues, appellant argues that the evidence is legally insufficient to support his four convictions because the State failed to prove that the car crash "occurred because of the intoxication" and the State failed to prove that the car crash "occurred due to accident or mistake."

We review the legal sufficiency of the evidence by considering all of the evidence in the light most favorable to the jury's verdict to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Williams v.*

---

[11]    A copy of complainant 3's autopsy report was admitted into evidence. It stated that complainant 3, a four-year-old male child, died at 10:01 p.m. on March 14, 2021 at a hospital. Complainant 3 sustained multiple blunt force injuries to his head, torso, and extremities. He was a passenger in a car that was involved in a car crash and was taken to the hospital by a Life Flight helicopter. He was pronounced dead at the hospital thirteen minutes after arrival.

[12]    A copy of complainant 4's autopsy report was admitted into evidence. It stated that complainant 4, a six-month-old male child, died at 1:57 a.m. on March 15, 2021 at a hospital. Complainant 4 had scattered abrasions and contusions, broken teeth, jaw, ribs, and femurs, and thermal injuries to his scalp, neck, and back. He was a passenger in a car that was involved in a car crash and was taken to the hospital by a Life Flight helicopter.

44

*State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). We defer to the responsibility of the fact finder to resolve conflicts fairly in testimony, weigh the evidence, and draw reasonable inferences from the facts. *Williams*, 235 S.W.3d at 750. That said, our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which he is accused. *Id.*

In reviewing the sufficiency of the evidence, a court must consider both direct and circumstantial evidence and any reasonable inferences that may be drawn from the evidence. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *see also Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012) (evidence-sufficiency standard of review same for both direct and circumstantial evidence). "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them," in contrast to speculation, which "is mere theorizing or guessing about the possible meaning of facts and evidence presented." *Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007). A jury may draw multiple reasonable inferences from facts as long as each is supported by the evidence presented at trial. *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013).

Circumstantial evidence is just as probative as direct evidence in establishing the guilt of an actor and circumstantial evidence alone can be sufficient to establish guilt. *See Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13. "In circumstantial evidence cases, it is not necessary that every fact and circumstance point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances." *Temple*, 390 S.W.3d at 359 (internal quotations omitted).

For evidence to be sufficient, the State does not need to disprove every reasonable alternative hypothesis that is inconsistent with a defendant's guilt. *See Wise*, 364 S.W.3d at 903; *Cantu v. State*, 395 S.W.3d 202, 207–08 (Tex. App.— Houston [1st Dist.] 2012, pet. ref'd). Rather, a court considers only whether the inferences necessary to establish guilt are reasonable based on the cumulative force of all the evidence when considered in the light most favorable to the jury's verdict. *See Wise*, 364 S.W.3d at 903*; Hooper*, 214 S.W.3d at 13; *see also Murray v. State*, 457 S.W.3d 446, 448–49 (Tex. Crim. App. 2015) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination."). The jury, as the judge of the facts and credibility of the witnesses, could choose to believe or not to believe the witnesses, or any portion of their testimony. *Sharp v. State*, 707 S.W.2d 611, 614

(Tex. Crim. App. 1986); *Jenkins v. State*, 870 S.W.2d 626, 628 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd).

A person commits the offense of intoxication manslaughter if the person: (1) operates a motor vehicle in a public place; (2) is intoxicated; and (3) by reason of that intoxication causes the death of another by accident or mistake. *See* TEX. PENAL CODE ANN. § 49.08(a). To be "[i]ntoxicated" means: (1) "not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body" or (2) "having an alcohol concentration of 0.08 or more." *Id.* § 49.01(1), (2) (internal quotations omitted). The statutory definition of intoxication as not having the normal use of mental or physical faculties by reason of the introduction of alcohol, among other things, into the body, is the "impairment theory," while the statutory definition of having an alcohol concentration of 0.08 or more, is the "per se theory." *Kinnett v. State*, 623 S.W.3d 876, 899 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd). These theories are not mutually exclusive. *Id.* at 899–900; *see also Kirsch v. State*, 306 S.W.3d 738, 745 (Tex. Crim. App. 2010) (BAC test results, "even absent expert retrograde extrapolation testimony, are often highly probative to prove both per se and impairment intoxication").

As to whether a person's intoxication caused another's death, the Texas Penal Code defines causation, in pertinent part, as follows: "A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." TEX. PENAL CODE ANN. § 6.04(a).

Appellant, in his briefing, concedes that the evidence presented at trial permitted the jury to find that: (1) he was intoxicated at the time of the car crash; (2) immediately before the car crash, his Audi car was accelerating and continued to accelerate until the moment of impact; (3) his Audi car had no historical problem with its mechanics or electronics; and (4) his Audi car hit complainant 1's Toyota Camry car. But, according to appellant, the evidence was insufficient to support a finding that his intoxication was a "but for" cause of the complainants' deaths. Specifically, appellant asserts that there was no evidence showing why his Audi car continued to accelerate as it approached complainant 1's Toyota Camry car, why he did not swerve or use the brake, or whether the collision occurred by "accident and mistake."

In asserting that the evidence is insufficient to support causation, appellant relies on the Texas Court of Criminal Appeals's passing observation in *Hanna v. State* that "proof of the defendant's intoxication is not equivalent to proof of

48

causation." 426 S.W.3d 87, 98 n.57 (Tex. Crim. App. 2014). The evidence in this case, though, proves more than the fact appellant was intoxicated when the car crash occurred. Notably, Texas appellate courts, including this Court, have concluded that evidence that a defendant was intoxicated *and* driving above the speed limit when a fatal car collision occurs is sufficient to support a conviction for the offense of intoxication manslaughter. *See Hale v. State*, 194 S.W.3d 39, 40 (Tex. App.—Texarkana 2006, no pet.) (driving at high rate of speed while intoxicated cannot be characterized as insufficient conduct to cause accident); *Martinez v. State*, 66 S.W.3d 467, 470 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd) (evidence sufficient to support conviction for offense of intoxication manslaughter where witness testified he saw eighteen-wheeler truck "moving too fast" before collision and another witness stated defendant was driving over speed limit and appeared as if he had been drinking when he exited eighteen-wheeler truck); *Glauser v. State*, 66 S.W.3d 307, 313 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (evidence sufficient to support conviction for intoxication-manslaughter offense where defendant was driving 100 miles an hour at night in sixty-five-miles-per-hour zone, defendant admitted he had been drinking, defendant's BAC was 0.21, and in well-lit area with no visible obstructions, defendant, without ever applying his brakes, hit complainant and back of disabled car, which had its headlights and at least one taillight on).

49

Here, the evidence presented at trial showed that shortly before the car crash, appellant was stopped by a law enforcement officer for speeding. Deputy Clayton estimated that when he initiated the traffic stop, appellant had been driving close to ninety miles per hour. Clayton handcuffed appellant and found marijuana in appellant's Audi car, and appellant admitted that he had smoked marijuana. Clayton confiscated the marijuana found in appellant's Audi car, but he did not take appellant into custody, and appellant drove away.

A total of about nine minutes passed between the time appellant drove away from Deputy Clayton's traffic stop and the time he crashed into complainant 1's Toyota Camry car at a rate of over 100 miles per hour. Evidence showed that the distance between where appellant was stopped by Clayton and where he crashed into complainant 1's Toyota Camry car was 8.7 miles, which would typically take about fifteen to eighteen minutes to traverse.

During that nine-minute interval and just a few minutes after appellant drove away from Deputy Clayton's traffic stop, Runnels, who was driving westbound on FM 2920, saw a set of headlights "coming up behind" her truck "very quickly to the point where [she] thought that" the car was "going to hit [her]." The car "eventually backed . . . off," but Runnels continued to glance in her "rearview mirror . . . just to make sure that" the car "wasn't . . . going to get close again." As she approached the intersection at FM 2920 and Gosling Road, Runnels checked her mirrors and

50

moved "into the right-hand lane" so that she could make the right turn onto Gosling Road. She then saw the car fly past her. Runnels "grabbed [her] boyfriend's arm" and said, "They're going to hit someone." (Internal quotations omitted.) The next thing she saw was "a big ball of fire."

Blood drawn from appellant at the hospital following the car crash showed that appellant had a BAC of 0.15 grams of ethanol per 100 milliliters of blood, which was over the legal limit of 0.08 grams of ethanol per 100 milliliters of blood. *See* TEX. PENAL CODE ANN. § 49.01(1), (2). Testing of appellant's blood also showed that alprazolam and THC were present in appellant's bloodstream.

Dr. Kelly testified that as a person's blood alcohol level rises, "more complex [physiological] functions" become "compromised," so a person who has consumed alcohol experiences "things like increased reaction time, slowed information processing," and "increased risk-taking." A person "under the influence of ethanol," will "take longer to respond to situations" when driving. For instance, the person may have trouble "maintaining their position within the lane of travel," "seeing something and hitting the brakes if [he] need[s] to," or perceiving the distance between cars. Dr. Kelly also explained that THC could impair a driver's "cognition and perception" and cause issues with "increased reaction times, as well as . . . the ability to stay within" a traffic lane while driving. Further, THC could impair a driver's ability to "track[], . . . mean[ing]" that when the driver was following a car

51

that "change[d] [its] speed," the driver's "perception of that speed changing [would] also impaired under the influence of THC."

Dr. Kelly also explained that alprazolam, like ethanol, was "classified as a central nervous system depressant so [a person] would expect th[e] same kinds of issues with impairment while driving as [he] would with ethanol." She noted that some common side effects that people experience when talking alprazolam "included drowsiness, confusion, [and] sedation." And if a person took "a combination" of ethanol, tetrahydrocannabinol, and alprazolam, the person would "have more impairment" than with "just one" of those substances.

In drawing inferences from the evidence, jurors "may use common sense, common knowledge, personal experience, and observations from life." *Edwards v. State*, 666 S.W.3d 571, 574 (Tex. Crim. App. 2023); *see also Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014). Given that appellant was speeding before Deputy Clayton's traffic stop and continued to speed after the stop, even in a suburban area, there was no need for independent evidence showing why appellant's Audi car continued to accelerate before hitting complainant 1's Toyota Camry car. The jurors could apply their "common sense, common knowledge, personal experience, and observations from life" to draw reasonable inferences from the evidence presented at trial about why appellant's Audi car continued to accelerate as it approached complainant 1's Toyota Camry car, why appellant did not swerve

or use the brake, or whether the collision occurred by "accident and mistake." *See Edwards*, 666 S.W.3d at 574.

Viewing all the evidence in the light most favorable to the jury's verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt that appellant operated a motor vehicle in a public place, while intoxicated, and by reason of that intoxication, caused the deaths of the complainants by accident or mistake. *See* TEX. PENAL CODE ANN. § 49.08(a). Accordingly, we hold that the evidence is sufficient to support appellant's four convictions for the offense of intoxication manslaughter.

We overrule appellant's first and second issues.

## Motion for Mistrial

In his third issue, appellant argues that the trial court erred in refusing to grant his motion for a mistrial because there was "an extraordinary outburst in the courtroom[] . . . in front of the jury," "after the trial court [had] issued an order for spectators to be silent."

We review the denial of a motion for mistrial for an abuse of discretion. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). In applying an abuse-of-discretion standard of review, we uphold the trial court's decision to deny a mistrial "if it was within the zone of reasonable disagreement." *Id.*; *see also Griffin v. State*, 571 S.W.3d 404, 416 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd). In

determining whether a trial court abused its discretion by denying a mistrial, we balance three factors: (1) the severity of the misconduct (including its prejudicial effect); (2) the effectiveness of the curative measures taken; and (3) the certainty of the conviction or punishment assessed absent the misconduct. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004); *Verdine v. State*, No. 01-18-00884-CR, 2020 WL 1584468, at *9 (Tex. App.—Houston [1st Dist.] Apr. 2, 2020, pet. ref'd) (mem. op., not designated for publication).

"Mistrial is an appropriate remedy in extreme circumstances for a narrow class of highly prejudicial and incurable errors." *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009) (internal quotations omitted); *see also Archie v. State*, 340 S.W.3d 734, 739 (Tex. Crim. App. 2011) (granting motion for mistrial is appropriate when "the objectionable events are so emotionally inflammatory that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant" (internal quotations omitted)); *Hawkins*, 135 S.W.3d at 77 (mistrial is trial court's remedy "for improper conduct that is so prejudicial that expenditure of further time and expense would be wasteful and futile" (internal quotations omitted)); *Williams*, 417 S.W.3d at 175 ("A mistrial is an extreme remedy and should be exceedingly uncommon."). Otherwise, when the prejudice is curable, an instruction by the trial court to disregard eliminates the need for a mistrial. *Young v. State*, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004).

The Texas Court of Criminal Appeals has "held that an outburst from a bystander or witness which interferes with the normal proceedings of a trial will not result in reversible error unless the defendant shows that a reasonable probability exists that the conduct interfered with the jury's verdict." *Coble v. State*, 330 S.W.3d 253, 292–93 (Tex. Crim. App. 2010) (internal quotations and alterations omitted). The court observed that a trial court's instruction to the jury to disregard the outburst is "generally considered sufficient to cure the impropriety because it is presumed that the jury will follow th[at] instruction[]." *Id.*; *see Guerrero v. State*, 528 S.W.3d 796, 801 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd).

In his briefing, appellant characterizes the evidence presented at trial to be "heavily disputed" as to whether his intoxication was the "but for" cause of the car crash or whether it was an "accident as opposed to a deliberate act." Appellant argues that because these types of "technical disputes are readily overcome by emotional pleas," and "the outburst from the family or supporters of the State is exactly the type of conduct that should result in a mistrial," the trial court erred in denying his motion for mistrial.

Appellant does not quarrel with the trial court's description of the events that precipitated his motion for mistrial. The trial court explained that it "sense[d] that" it "was a good time to take a break" because the testimony from Chapin, the Forensic Death Investigator at HCIFS, was likely to be "emotional testimony for someone

who knew the complainants." The Court released the jury "in an effort to give those family members a breather," but before all twelve jurors had left the courtroom, a woman in the courtroom "began audibly sobbing." The trial court "asked everyone to leave" the courtroom, and the State escorted the family members of the complainants out of the courtroom. The record shows that another woman also screamed or wailed loudly after being escorted out of the courtroom but still within earshot of the jury.

The trial court noted that there were "audible displays of emotion," but no actual words were spoken by the two women. The women were not witnesses, and they did not return to the courtroom after the break.

To minimize the effect of the outburst and cure any potential harm, the trial court instructed the jury as follows:

> . . . [Y]ou are instructed to disregard the emotional outburst that occurred just before you left the courtroom and you are instructed that you may not consider it as any evidence or for any purpose whatsoever. You may also not mention it nor discuss it in any of your deliberations.

The trial court also polled the jurors individually, and they all affirmed that they would "not consider the emotional outburst for any reason and [would] base [their] verdict solely on the facts and evidence presented in this case."

We reject appellant's request for a bright-line rule that would require a trial court to grant a mistrial whenever an emotional outburst occurs during trial because such a rule would be contrary to precedent. *See Archie*, 340 S.W.3d at 739 (mistrial

warranted when "the objectionable events are so emotionally inflammatory that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant" (internal quotations omitted)).  The situation here does not fall within the "narrow class of highly prejudicial and incurable errors" that would require the trial court to grant a motion for mistrial.  *See Ocon*, 284 S.W.3d at 884.

Further, appellant does not explain how, in his view, the measures taken by the trial court in sending the jury out of the courtroom as soon as it noticed that some observers were becoming emotional, instructing the jury to disregard the emotional outburst, and polling the jurors to ensure that the emotional outburst would not affect their deliberations in the case, were insufficient to cure any potential for unfair prejudice.  We presume that the jury followed the trial court's instruction.  *Coble*, 330 S.W.3d at 292–93.

Finally, according to appellant, the trial court erred in relying on *Robinson v. State*, No. AP-76,535, 2013 WL 2424133 (Tex. Crim. App. June 5, 2013) (not designated for publication), in deciding to deny his motion for mistrial, "because it was an unpublished-death-penalty case."  The Texas Rules of Appellate Procedure state that "[u]npublished opinions have no precedential value and must not be cited as authority by counsel or by a court."  TEX. R. APP. P. 77.3; *see also Skinner v. State*, 293 S.W.3d 196, 202 (Tex. Crim. App. 2009).  But appellant concedes that *Robinson* based its analysis on other, published cases that applied the correct

analysis to determine whether a trial court acted within its discretion in ruling on a motion for mistrial. In short, appellant does not assert that the trial court's reliance on the Texas Court of Criminal Appeals's unpublished decision in *Robinson* affected his substantial rights and thus, he has not demonstrated reversible error. *See* TEX. R. APP. P. 44.2(b).

Based on the foregoing, we hold that the trial court did not err in denying appellant's motion for mistrial.

We overrule appellant's third issue.

## Modification of Judgments

Here, the trial court's written judgments in trial court cause numbers 1795834[13] and 1795837[14] do not accurately comport with the record in those cases in that the judgments state that appellant "pleaded true" in regard to appellant's pleas to the "1st [e]nhancement [p]aragraph[s]." The records, however, show that appellant pleaded "[n]ot true" to the "1st [e]nhancement [p]aragraph" alleged in each case.

"[A]ppellate court[s] ha[ve] the power to correct and reform a trial court judgment 'to make the record speak the truth when [they] ha[ve] the necessary data and information to do so[] or make any appropriate order as the law and nature of

---

[13] Appellate cause number 01-22-00957-CR.

[14] Appellate cause number 01-22-00959-CR.

58

the case may require.'" *Nolan v. State*, 39 S.W.3d 697, 698 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (quoting *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet ref'd)). This is true no matter who, or if anyone, has called the matter to the attention of the appellate court. *See French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992); *see also Asberry*, 813 S.W.2d at 529–30 ("The authority of an appellate court to reform incorrect judgments is not dependent upon the request of any party, nor does it turn on the question of whether a party has or has not objected in the trial court.").

Accordingly, we modify the trial court's judgment in trial court cause number 1795834 to state "Not True" in regard to appellant's plea to the "1st [e]nhancement [p]aragraph." We further modify the trial court's judgment in trial court cause number 1795837 to state "Not True" in regard to appellant's plea to the "1st [e]nhancement [p]aragraph." *See* TEX. R. APP. P. 43.2; *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993).

## Conclusion

We affirm the judgments of the trial court in trial court cause numbers 1795835 and 1795836. We affirm the judgments of the trial court as modified in trial court cause numbers 1795834 and 1795837.

Julie Countiss
Justice

Panel consists of Justices Kelly, Countiss, and Rivas-Molloy.

Do not publish. TEX. R. APP. P. 47.2(b).